No. 12-16272

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FEDERICO AGUILAR MURILLO, et al.,
*Plaintiffs-Appellants*

v.

SERVICIOS AGRICOLAS MEX, INC.., et al.,
*Defendants-Appellees*

ON APPEAL FROM UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
CIVIL CASE NO. 2:07-cv-02581 (Honorable G. Murray Snow)

APPELLANTS' REPLY BRIEF

Pamela M. Bridge
COMMUNITY LEGAL SERVICES
305 South Second Avenue
Phoenix, Arizona 85036
Tel: (602) 258-3434

Nicholas C. Marritz
FARMWORKER JUSTICE
1126 16th St. NW, Suite 270
Washington, DC 20036
Tel: (202) 293-5420

Gregory S. Schell
Migrant Farmwoker Justice Project
FLORIDA LEGAL SERVICES, INC.
508 Lucerne Avenue
Lake Worth, Florida 33460-3819
Tel: (561) 582-3921

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii, iii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

I. SAMI's Failure to Offer Work to the U.S. Farmworkers Violated the Regulatory Obligations Imposed on SAMI as a Condition of its Participation in the H-2A Program . . . . . . . . . . . . . . . . . . . . . . . . .1

   A. Under the terms of SAMI's H-2A labor certification, SAMI was required to offer work to the U.S. Farmworkers . . . . . . . . . . . 2

   B. SAMI failed to comply with its U.S. Farmworker recruitment obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

   C. DOL's approval of SAMI's H-2A labor certification application does not shield SAMI from liability to the U.S. Farmworkers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II. SAMI Violated the Working Arrangement Provisions of the AWPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   A. SAMI's obligation under the H-2A regulations to offer work to the U.S. Farmworkers formed part of the AWPA working arrangement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   B. SAMI misconstrues the AWPA case law . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . 24

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

CASES

*Bernett v. Hepburn Orchards, Inc.*, 1987 WL 16939 (D. Md., Apr. 14, 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14, 17**

*Doe v. D.M. Camp & Sons*, 624 F.2d 1153 (E.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16, 19, 22**

*Donaldson v. U.S. Depar't of Labor*, 930 F.2d 339 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14, 21, 22, 23**

*Camp & Sons,* 624 F. Supp. 2d. 1153 (E.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16, 19**

*Elton Orchards, Inc. v. Brennan*, 508 F.2d 493, 500 (1st Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

*Leach v. Johnston*, 812 F. Supp. 1198 (M.D. Fla. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Martinez v. Shinn*, 992 F.2d 997 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . **19**

*Montelongo v. Meese,* 803 F.2d 1341 (5th Cir. 1986) . . . . . . . . . . . . . . . **10**

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19, 20, 21, 22**

*Vega v. Nourse Farms*, 62 F. Supp. 2d 334 (D. Mass. 1999) . . . . . . . . . . **14**

Statutes

8 U.S.C. § 1188(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

## Regulations

20 C.F.R § 655.90(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**2**

20 C.F.R. § 655.103(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3, 10, 21**

20 C.F.R. § 655.103(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

20 C.F.R. § 655.103(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

20 C.F.R. §655.103(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3, 10, 21, 22**

20 C.F.R. § 655.105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1, 3, 8, 22**

20 C.F.R. § 655.106(b)(1)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

29 C.F.R. § 2.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

## Secondary Authorities

H.R. Rep. 99-682 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . **13**

53 FR 22076 (June 13, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

53 FR 22088, 22089 (June 13, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . **11**

Daniel B. Conklin, Assuring Farmworkers Receive Their Promised Protections: Examing the Scope of AWPA's "Working Arrangement", 19 Kan. J. L. & Pub. Pol'y 528 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

# ARGUMENT

## I. SAMI's Failure to Offer Work to the U.S. Farmworkers Violated the Regulatory Obligations Imposed on SAMI as a Condition of its Participation in the H-2A Program.

In 2006, farm labor contractor Servicios Agrícolas Mex, Inc. ("SAMI") sought to bring 150 workers from Mexico into the United States under the H-2A temporary agricultural guestworker visa program. SAMI wished to hire these Mexican farmworkers to harvest citrus groves owned or leased by its clients, Marlin Growers and Marlin Ranching ("Marlin"), for the 2006-07 harvest season. As required by the H-2A regulations, SAMI applied to the U.S. Department of Labor ("DOL") for a "certification" of requisite labor conditions, including that U.S. workers were not available to fill the jobs. To that end, under the authority granted it by 20 C.F.R. § 655.105(a), the DOL required SAMI to contact its former U.S. farmworker employees (hereafter, "U.S. Farmworkers") and offer them their jobs back as a condition of labor certification. In its brief, SAMI attempts to recast the events in this case to excuse its failure to offer jobs to the hundreds of U.S. workers it employed to harvest the Marlin citrus crop in prior seasons. Despite these efforts, three fundamental facts essential to understanding SAMI's H-2A obligations

remain undisputed.

First, SAMI's 2006-07 labor certification application requested workers for multiple job sites, including locations where the U.S. Farmworkers worked for SAMI and Marlin in previous seasons. Second, SAMI failed to take affirmative steps, either before or after receiving temporary labor certification, to rehire any U.S. Farmworkers who had worked for SAMI in previous seasons. Finally, SAMI failed to alert the DOL to this fact, leading the agency to grant in full SAMI's application for H-2A labor certification. Had the DOL known of SAMI's failure to fulfill its U.S. worker recruitment obligations, SAMI's application would have almost certainly been denied.

**A.    Under the terms of SAMI's H-2A labor certification, SAMI was required to offer work to the U.S. Farmworkers.**

In order to effectuate the Immigration and Nationality Act's hiring preference for domestic workers,[1] federal regulations require prospective H-2A employers to cooperate with state workforce agencies in independently contacting potential workers "by letter and/or telephone."

---

[1] *See* 20 C.F.R. § 655.90(d).

2

20 C.F.R. §655.103(d)(3). Exercising its oversight authority under 20 C.F.R. §655.105(a), the DOL, in its June 27, 2006 notice accepting SAMI's certification application, stated that in order to satisfy the U.S. worker recruitment requirements of 20 C.F.R. §655.103(d) and (f), SAMI would need to "contact former U.S. employees, and solicit their return to the job." *See* ER 9 at ¶ 50.

In its brief, SAMI argues that, as workers in the Yuma Valley groves in the 2004-05 and 2005-06 harvests, the U.S. Farmworkers were not "former" workers entitled to notice because the DOL granted SAMI "certification to employ H-2A workers at White Wing." *See* Employers' Brief at 16. Because none of them worked at White Wing in the prior year, SAMI argues, and the district court held, the U.S. Farmworkers were not entitled to notice. *See* ER 29.

However, contrary to SAMI's characterization of the geographic scope of its application and the DOL's certification, the DOL did *not* certify the use of H-2A workers only at White Wing. Rather, SAMI sought to employ H-2A workers at four separate areas, of which White Wing was but one. *See* ER 8-9 at ¶¶ 42 and 47. In fact, Marlin had its greatest acreage in the Yuma Valley, where the U.S. Farmworkers had worked as citrus

3

harvesters with SAMI in the previous two seasons. *See* ER 1, 6-8 at ¶¶ 30, 42, and 46. Thus, there is no basis for concluding that the U.S. Farmworkers, who had worked previously for SAMI in the Yuma Valley, were not "former U.S. employees" entitled to be contacted about the 150 jobs described in SAMI's application for H-2A labor certification.

In an attempt to buttress its position, SAMI points to the district court's finding that generally, San Luis workers would not work at jobs in White Wing. *See* Employers' Brief at 18. However, although at one point it stated there was testimony that San Luis workers would not go to White Wing, *see* ER 14 at ¶ 69, the district court stopped short of finding that San Luis workers would not harvest White Wing groves under any circumstances. *See* ER 17 (finding only that some San Luis workers were not willing to live in and work from the White Wing housing). This hardly precluded the workers from performing the job tasks described in the job order, as a San Luis-based crew, operating out the *corralón*, evidently did for SAMI during the following 2007-08 season. *See* ER 204. Furthermore, it is entirely possible that San Luis workers would have considered White Wing-based work because of the higher wages and benefits SAMI was required to offer as an H-2A employer. *See* ER 206 (SAMI's owner notes

4

that the guaranteed wage for the job was over 50 percent higher than the minimum wage guaranteed pickers working for non-H-2A employers). The district court found considerable fluidity in the San Luis farm labor market, with workers often switching jobs in search of better wages and higher-yielding groves. *See* ER 3 at ¶14. In fact, a single contractor could, and often did, harvest Marlin's White Wing and Yuma Valley groves during the same harvest season.[2] SAMI's workers harvested fruit at both White Wing and the Yuma Valley during the 2006-07 season, as had SAMCO's H-2A workers the previous year. *See* ER 8 and 10 at ¶¶ 42 and 54. In the 2007-08 season, SAMI used a crew of U.S. workers based in San Luis to fill the manpower requirements of the job order, supposedly including the White Wing, as well as the Yuma Valley groves. *See* ER 204.[3]

---

[2] SAMI does not dispute that the White Wing groves are within normal commuting distance of San Luis, as that term is defined by the DOL with respect to the H-2A program. *See* U.S. Farmworkers' Opening Brief at 22-23.

[3] Efficiency may have dictated multiple bases for the work, one in White Wing and one in San Luis. Marlin harvested its crop in this fashion in the 2004-05 and 2005-06 seasons, with SAMCO handling the White Wing area and SAMI harvesting most of the Yuma Valley and Bard, California groves. *See* ER 6-8 at ¶¶ 30, 36, and 40. In 2006-07,

5

Thus, it is reasonable to suppose that many San Luis workers would have been willing to accept White Wing-based employment, given the higher wages and benefits. However, as described below, because SAMI failed to notify them of the 2006-07 job opportunities, the U.S. Farmworkers were never given the opportunity to make that choice.

## B. SAMI Failed to Comply With Its U.S. Farmworker Recruitment Obligations.

SAMI mistakenly asserts that the U.S. Farmworkers concede that SAMI did not breach the terms of its job clearance order. *See* Employers' Brief at 11 and 24. Likewise, SAMI is sorely mistaken when it insists that it "scrupulously adhered to and closely coordinated with DOL in

---

SAMI tried to harvest both sites with White Wing-based crews, but was unable to pick its full assigned acreage in the Yuma Valley. *See* ER 26 n.6. Notably, in the following 2007-08 season, SAMI employed both an H-2A workforce and a San Luis-based crew of U.S. workers. *See* ER 204. SAMI was not "required to terminate [its] operations from the San Luis *corralón*" merely because only two foremen appeared at the August 2006 meeting in San Luis. *See* Employers' Brief at 16-17. Indeed, SAMI operated out of the *corralón* in 2007-08 with a single San Luis foreman. *See* ER 204. Thus, SAMI's decision to make White Wing its sole base for the 2006-07 harvest was purely a business decision, which cannot serve as a basis for preferring guestworkers over U.S. workers. *See Elton Orchards, Inc. v. Brennan*, 508 F.2d 493, 500 (1st Cir. 1974).

connection with specified recruitment activities…" *See* Employers' Brief at 15. Indeed, SAMI admits that it did not contact any of its U.S. workers from the 2004-05 or 2005-06 seasons, either by letter or by telephone. *See* ER 10 at ¶ 52; Employers' Brief at 15. SAMI does not contend that it actually took any affirmative steps to contact the U.S. Farmworkers. Instead, SAMI states that either Arizona's Department of Economic Security ("DES") or SAMI's own foremen should have contacted the U.S. Farmworkers. However, the responsibility for compliance with the U.S. worker recruitment requirements ultimately lies with SAMI and SAMI alone.

SAMI asserts that its failure to contact the U.S. Farmworkers should be excused because it appears that Arizona's state workforce agency, DES, had sent letters to SAMI's workers in some prior years, notifying them of work in the coming season. *See* ER 24; Employers' Brief at 15. However, SAMI admits that DES's actions in past years are "not entirely clear," and concedes that it did not request that DES send letters regarding the 2006-07 harvest jobs. *See* Employers' Brief at 15; ER 205.

SAMI also suggests that it attempted to satisfy its positive recruitment obligations through the crew foremen because "in practice the

7

recruitment of San Luis workers is conducted not by the growers or the farm labor contractors directly but rather by their field foremen." *See* Employers' Brief at 22; ER 206. However, SAMI's dealings with the foremen were not designed to ensure that its former workers received timely notice of the job opportunities in the 2006-07 harvest.

In its June 27, 2006 notice to SAMI, issued pursuant to 20 C.F.R. § 655.105(a), the DOL directed SAMI to immediately undertake and document the specified positive recruitment activities. SAMI was to report the results of these efforts to the DOL by July 13 so that the agency could adjudicate SAMI's temporary labor certification application. ER 89.[4] SAMI's pre-harvest meeting with the foremen at the San Luis McDonald's did not occur until early August, three weeks after SAMI had received approval to hire 150 H-2A workers. *See* ER 207 and 209. Had SAMI truly intended to satisfy its U.S. worker recruitment obligations through the crew foremen, this meeting could have been held between June 27 and July 13, the period during which the DOL required SAMI to carry out its U.S. worker recruitment obligations.

---

[4] In order to meet regulatory deadlines, the DOL granted SAMI's temporary labor certification application the following day, July 14.

The meeting with the foremen proved an ineffective means of getting word of the job opportunities to the U.S. Farmworkers. First, attendance at the meeting was poor, with only two of five foremen appearing. *See* ER 11 at ¶ 56. This seems due to poor planning on SAMI's part. Rather than contacting the foremen himself regarding the meeting at McDonald's, SAMI president Richard DeLeon delegated this task to supervisor Oscar Aguayo, Jr. *See id.* Two of the foremen, José Gonzalez and Humberto Gaxiola, were never contacted by Aguayo before or after the McDonald's meeting regarding work for their respective crews during the upcoming 2006-07 harvest. *See* ER 11-12 at ¶¶ 58-59.

The McDonald's meeting was no more effective in providing notice of the job opportunities to the U.S. Farmworkers who worked with the two foremen who did attend, Leobardo Aguirre and Julio De La Rocha. Although general information regarding the upcoming harvest was disseminated, SAMI did not ask the two foremen to take any action. Significantly, SAMI did not direct the two foremen to assemble their U.S. farmworkers for the upcoming harvest. *See* ER 11 at ¶ 57. Neither at the McDonald's meeting nor later did SAMI instruct Aguirre and DeLa

Rocha to notify domestic workers of SAMI's 150 jobs. *See* ER 209-210.[5] Thus, SAMI's meetings with its foremen utterly failed to satisfy its U.S. worker recruitment requirements.

The H-2A regulations make clear that the responsibility for compliance with the U.S. worker recruitment requirements lies with the petitioning employer alone. *See* 20 C.F.R.§ 655.103(d) ("*[t]he employer* shall *independently* engage in positive recruitment" of U.S. workers; *id.* at § 655.103(f) "[*t]he employer* shall perform the other specific recruitment and reporting activities"specified in the DOL's notice) (emphasis added).Thus, SAMI and no one else is responsible for its failure to comply with its U.S. worker recruitment obligations.

---

[5] SAMI also failed to provide the work it had promised to those U.S. workers in the crew headed by its former foreman, Jose Castano. *See* ER 12 at ¶¶60-62. Notably, by that point, SAMI had already been approved for a full contingent of H-2A workers. As the Fifth Circuit observed in an earlier case where U.S. workers once recruited were ultimately denied jobs in favor of guestworkers, "[w]ith an adequate supply of workers from across the border, [the employers] no longer needed domestic crews. Thus, when the crew leaders appeared as agreed…[the employer's representative] informed them that the deal was off…" *Montelongo v. Meese*, 803 F.2d 1341, 1345 (5th Cir. 1986).

**C.    DOL's approval of SAMI's H-2A labor certification application does not shield SAMI from liability to the U.S. Farmworkers.**

By July 13, 2006, SAMI was required to report to the DOL as to the results of its U.S. worker recruitment efforts. Because neither SAMI nor the state workforce agency identified any U.S. workers recruited, on the following day, the DOL certified in full SAMI's temporary labor certification.

What SAMI failed to advise the DOL was that it had totally ignored its obligation to contact its former U.S. employees of the job opportunities, as directed in the DOL's June 27, 2006 notice. Had SAMI candidly acknowledged this fact, the agency almost certainly would have denied SAMI's application, as required by both the Immigration and Nationality Act and applicable DOL regulations and policies. *See* 8 U.S.C. §1188(b)(6); 20 C.F.R. §655.106(b)(1)(v); H-2A Program Handbook, 53 Fed.Reg. 22088, 22089 (June 13, 1988).[6]

---

[6]SAMI points to the failure of the U.S. Farmworkers to present testimony from the DOL. *See* Employers' Brief at 21. However, it is SAMI's burden to demonstrate that, despite its failure to undertake any affirmative steps to contact its former U.S. workers, it nonetheless met the U.S. worker recruitment requirements of the DOL's June 27, 2006 notice. Furthermore, DOL officials do not ordinarily testify in civil actions and their attendance at deposition or trial may be obtained only

11

Ultimately, SAMI's temporary labor certification application was approved in full. *See* ER 10 at ¶ 53. SAMI claims that the U.S. Farmworkers' real dispute is with the DOL's certification decision, a decision the district court held was entitled to deference. *See* Employers' Brief at 11; ER 26. SAMI argues that its actions should be excused because the DOL ultimately approved its temporary labor certification application, albeit without ever being informed that SAMI had failed to comply with its positive recruitment obligations.

Nonetheless, having obtained labor certification via its misleading silence, SAMI urges that deference be afforded "the determination by DOL that SAMI had complied with the recruitment obligations specified by DOL," even suggesting that these findings should be reviewed under a "clearly erroneous" standard borrowed from the Administrative Procedures Act. *See* Employers' Brief at 19 and 21. The district court took a similar tack, holding that questions regarding SAMI's compliance with its positive recruitment obligations be left to the DOL. *See* ER 26.

In its enactment of the current H-2A program as part of the

---

with the consent of the agency. *See* 29 C.F.R. § 2.22.

Immigration Reform and Control Act of 1986, Congress directly addressed

this issue, making clear that the DOL's authority to investigate employers'

visa applications does not deprive injured parties of the right to seek relief:

> If the Department's findings are based on information provided by the employer which the employer knew to be false, nothing in this section would preclude an injured worker from seeking appropriate relief.

H.R. Rep. 99-682, at 182 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649,

5686;[7] *see also* ER 9-10 at ¶50; H-2A Program Handbook, 53 Fed. Reg. at

22076 (June 13, 1988) ("[i]n making a finding of U.S. worker availability,

the [DOL] must have accurate documentation from the Employment

Service offices and from the employer of the efforts put forth by the

employer and the [state workforce agency] and the recruitment results").

---

[7]SAMI also suggests that its failure to contact the U.S. Farmworkers should be excused because "[a]t no time was [SAMI'S president] informed by DOL, DES or any state or federal agency that SAMI's recruitment efforts or reporting requirements were in any way deficient or noncompliant with the applicable regulations or directives." *See* Employers' Brief at 21. SAMI's suggestion that it relied on at least tacit governmental approval of its actions would have considerably more force had the company ever inquired whether its wholesale failure to contact former U.S. employees nonetheless met the requirements of DOL's July 2006 notice. However, nothing in the record suggests that SAMI ever sought the advice or counsel of any agency in this regard.

Consistent with this statement of Congressional purpose, domestic farmworkers have on multiple occasions brought suit against agricultural employers who have obtained labor certification despite misrepresentations made to the DOL. For example, in *Donaldson v. United States Dep't of Labor*, 930 F.2d 339 (4th Cir. 1991), domestic workers were allowed to bring suit to challenge the wage rates paid them, which, despite being approved by the DOL, allegedly violated applicable regulations. Similarly, domestic farmworkers successfully brought suit when they were denied jobs after failing a pre-employment skills test that the grower had not mentioned in its job order, despite signing an assurance that the order contained all material terms of the job. *Bernett v. Hepburn Orchards, Inc.*, 1987 WL 16939 (D. Md., Apr. 14, 1987).

Here, SAMI does not dispute that, in its documentation of its domestic worker recruitment efforts, SAMI failed to notify DOL of its failure to recruit its former U.S. workers. This made its report to DOL false, misleading, and unworthy of judicial deference. *See Vega v. Nourse Farms*, 62 F. Supp. 2d 334, 346 (D. Mass. 1999) ("Silence, in many circumstances, can be even more misleading than direct representations."). In the absence of any meaningful administrative remedy, then, the U.S.

14

workers were justified in bringing suit under the "working arrangement" provisions of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA").

## II.   SAMI Violated the Working Arrangement Provisions of the AWPA.

The U.S. Farmworkers and SAMI disagree fundamentally over the scope of the AWPA's working arrangement provisions.   The majority of courts construing this section have concluded that, at a minimum, the working arrangement between an employer and a farmworker implicitly includes compliance with federal and state laws intended to protect farmworkers.  *See* Daniel B. Conklin, *Assuring Farmworkers Receive Their Promised Protections:   Examining the Scope of AWPA's "Working Arrangement"*,19 Kan. J. L. & Pub. Pol'y 528, 529 (2010) ("A majority of courts have held that relevant statutes and regulations are implied terms of the working arrangement, while the minority holds that a working arrangement   only   includes expressly communicated terms.")   As demonstrated below, the district court's treatment of the so-called "50 percent rule" in this case, viewed in tandem with the pertinent case law, strongly support the incorporation of the H-2A program's U.S. worker

recruitment provisions into the AWPA working arrangement.

###### A. SAMI's obligation under the H-2A regulations to offer work to the U.S. Farmworkers formed part of the AWPA working arrangement.

The district court found that, "[t]o be sure, for purposes of applying the AWPA's protections, the 'working arrangement' between agricultural workers and their employer may include specific worker protections included in federal and state law." *See* ER 25.  Nonetheless, the district court drew a distinction between "specific worker protections included in federal and state law," which it held included the H-2A program's "50 percent rule," and the U.S. worker recruitment obligations imposed on H-2A employers by the same section of the H-2A regulations.  There is no principled basis for such a distinction.

While acknowledging that a number of federal and state legal protections are incorporated into the AWPA working arrangement between farmworkers and their employers, the district court cites the minority view expressed by a single federal district court, namely that the working arrangement only includes "the terms of employment actually communicated between employer and employee."  *See* ER 25, *citing Doe v. D.M. Camp & Sons*, 624 F. Supp. 2d 1153, 1172 (E.D. Cal. 2008).

16

However, the district court acknowledged that an employer who fails to offer work to U.S. worker applicants *after* receiving DOL certification violates the AWPA's working arrangement provisions. This is because the AWPA working arrangement incorporates the regulatory requirement that H 2A employers hire U.S. workers throughout the first 50 percent of the contract period-the so-called "50 percent rule." *See* 20 C.F.R. § 655.103(e). Thus, the district court awarded damages to the members of José Castano's crew based on SAMI's breach of the AWPA working arrangement-the failure to comply with the H-2A 50 percent rule. *See* ER 31. The members of Castano's crew recovered despite the fact that there was no evidence that the 50 percent rule was among "the terms of employment actually communicated between [SAMI] and [the Plaintiffs]," or that any of the Castano crew members ever directly spoke with SAMI regarding work in the 2006-07 harvest. *See* ER 12 at ¶¶ 61-62 (SAMI's only contact was with foreman Castano).

In this regard, the district court's ruling was consistent with other decisions in which domestic workers have recovered damages under the AWPA's working arrangement provision for the failure of an H-2A employer to offer them work. *See Bernett*, 1987 WL 16939, at *7. The

17

events in this case demonstrate the almost arbitrary nature of distinguishing between the employers' obligations under the AWPA to those U.S. workers denied employment during the pre-certification positive recruitment period and those turned down for jobs thereafter. The Castano crew members were awarded damages because SAMI's president encountered Castano at a San Luis gas station and asked him to recruit his domestic crew. *See* ER 12 ¶ 61. But for this brief conversation at the gas station, the members of the Castano crew would almost certainly have been denied damages by the district court. The U.S. Farmworkers in the remaining four crews were not as fortunate. Those in the Aguirre and De La Rocha crews were never recruited because SAMI did not instruct these foremen to go out and line up their domestic worker crews. *See* ER 11 at ¶ 57; *id*. at 210. Those U.S Farmworkers who had previously worked in the Gonzalez and Gaxiola crews were not recruited because SAMI never contacted these foremen, either before or after the meeting at McDonald's. *See* ER 11-12 at ¶¶ 58-59. Because of SAMI's hiring policies, all of these workers were denied the preference due U.S. workers under the Immigration and Nationality Act. Yet, under the district court's formulation, the only U.S. Farmworkers to recover were those

18

whose foreman fortuitously met SAMI's president at a gas station.  There is nothing in the AWPA's legislative  history or in any prior cases suggesting the farmworkers' rights under the Act should turn on such random and largely inconsequential events.[8]

## B.    SAMI Misconstrues the AWPA Case Law.

SAMI fundamentally misconstrues the cases cited by the U.S. Farmworkers in their opening brief.

First, SAMI denies that the Fifth Circuit's decision in *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985)  conflicts with  *Doe v. D.M. Camp & Sons*, 624 F. Supp. 2d. 1153, 1172 (E.D. Cal. 2008), the latter cited by the district court for the

_____

[8]SAMI misstates the U.S. Farmworkers' position regarding damages, claiming that "Plaintiffs concede in their brief that … they were unable to establish any actual damages 'resulting [from] SAMI's failure to notify them of the job."  Employers' Brief at 18-19.  In fact, there were unquestionably actual damages in terms of lost work opportunities, as the district court concluded with respect to members of the Castano crew.  *See* ER 12 at ¶62 (crew members lost two weeks of work waiting in vain for employment with SAMI).  The U.S. Farmworkers seek statutory damages under the AWPA in part because of the difficulty of quantifying their actual damages.  *See Martinez v. Shinn*, 992 F.2d 997, 999 (9th Cir. 1993); *Leach v. Johnston*, 812 F. Supp. 1198, 1211 (M.D. Fla. 1992).

proposition that the AWPA working arrangement consists only of those terms of employment "actually communicated between employer and employee." *See* Employers' Brief at 32. However, *Salazar-Calderon* specifically held that, where the H-2A regulations required an employer to offer prospective workers certain terms and conditions of employment, those terms and conditions formed part of the FLCRA "work agreement"-the precursor to the AWPA "working arrangement"-as a matter of law, even if the employer never actually communicated those terms to the prospective employee. 765 F.2d at 1341-42. This holding cannot be reconciled with the *Doe* district court decision.

While the two cases are inherently conflicting, *Salazar-Calderon's* reasoning is by far the more persuasive. Under the working arrangement standard articulated by *Doe* and invoked by the district court, an employer can evade AWPA liability simply by failing to "actually communicate" terms of employment to prospective employees, even where the DOL has required the employer to do so. By contrast, *Salazar-Calderon* makes clear that employers who shirk their duties to their workers under the H-2A program cannot escape liability simply by keeping the workers in the dark.

20

SAMI's attempt to distinguish *Donaldson v. United States Dep't of Labor*, 930 F.2d 339 (4th Cir. 1991) is similarly unavailing. As the *Donaldson* court noted, the AWPA expressly creates a private federal right of action for any person aggrieved by a violation of the Act or any regulation under it. 930 F.2d at 349. The court found that H-2A regulations that imposed "substantive obligations" on employers or farm labor contractors formed part of the AWPA working arrangement -indeed, the Fourth Circuit deemed this result "necessarily contemplated by the interrelated structures of these separate statutory regimes." *Id*. at 350.

Plaintiffs recognize, as SAMI points out, that both *Salazar-Calderon* and *Donaldson* involved the employer's failure to offer or comply with terms required by the H-2A "job order" regulations, rather than the "positive recruitment" or "other recruitment" regulations. *See* Employers' Brief at 29-31; *compare* 20 C.F.R. § 655.102 *with* 20 C.F.R. § 655.103(d) and (f). However, the reasoning in both cases strongly supports the incorporation of the U.S. worker recruitment requirements into the AWPA working arrangement.

The *Salazar-Calderon* court held that the AWPA working arrangement included H-2A job order regulations "because such

regulations have the force of law." 765 F.2d at 1341; *see also id.* at 1342. The *Donaldson* court reached the same conclusion because the job order regulations imposed "substantive obligations" on H-2A employers with respect to farmworkers. 930 F.2d at 350. The H-2A recruitment regulations at issue here are of the same imperative character. Specifically, 20 C.F.R. § 655.103(f) provides that "[t]he employer *shall perform* the other specific recruitment and reporting activities specified in the notice from the [DOL] required by [20 C.F.R.] § 655.105(a)…" (emphasis added). As a validly-promulgated rule, this regulation has the force of law, one that imposes an affirmative duty on H-2A employers. Likewise, the DOL's notice in this case expressed SAMI's obligations in no uncertain terms: "[Y]ou are required to:…Contact former U.S. employees, and solicit their return to the job." ER 88-89. This manifestly imposed a substantive obligation on SAMI. Thus, the H-2A program's U.S. farmworker recruitment regulations fall squarely within the rationale of *Salazar-Calderon* and *Donaldson*.

The district court articulated a standard similar to those of *Salazar-Calderon* and *Donaldson*, noting that an H-2A regulation that "imposes an affirmative and specific duty on an H 2A employer with

22

respect to its U.S. employees or prospective employees" is incorporated in to the AWPA working arrangement. ER 28. However, in holding that the U.S. worker recruitment requirements did not satisfy this standard, the district court erred. *See id.* As the U.S. Farmworkers have shown, the recruitment requirements impose binding obligations on SAMI and should form part of the AWPA working arrangement as a matter of law.

## CONCLUSION

Congress structured the H-2A program so as to ensure that U.S. farmworkers would receive preferential consideration for agricultural jobs in this country and not be displaced by guestworkers. Congress likewise enacted the AWPA to provide farmworkers with a far-reaching, comprehensive mechanism for enforcing their employment rights. Because SAMI ignored its H-2A regulatory obligation to offer its 150 available jobs to the U.S. Farmworkers, this Court should reverse the judgment below and allow the workers to seek justice under the "working arrangement" provisions of the AWPA.

Respectfully Submitted,

*/S/Pamela M. Bridge*

Pamela M. Bridge
Gregg S. Schell
Nicholas C. Marritz

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,816 words according to the word-count function of WordPerfect 12, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that this brief complies with the typeface of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface, using WordPerfect 12, 14-point Century Schoolbook.

DATED this 8th day of March, 2013.


    */S/Pamela M. Bridge*
Pamela M. Bridge

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system on March 8, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 8th day of March, 2013.

    */S/Pamela M. Bridge*
Pamela M. Bridge